

Tagged Opinion

**ORDERED in the Southern District of Florida on October 09, 2007.**

*Paul G. Hyman, Chief Judge*
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:                          Case No.: 05-36668-BKC-PGH
                                Chapter 7 Proceeding
JAMES R. GELINAS,
VIRGINIA M. GELINAS,

        Debtors.
_____/


GOODSTEIN REALTY
BOCA RATON, LLC

        Plaintiff,
v.                              Adv. No.:06-01356-BKC-PGH-A

JAMES R. GELINAS, and
VIRGINIA M. GELINAS,

        Defendants.
_____/


### MEMORANDUM ORDER ON PLAINTIFF, GOODSTEIN REALTY BOCA RATON, LLC'S, COMPLAINT TO DETERMINE DEBT NONDISCHARGEABLE PURSUANT TO 11 U.S.C. § 523

**THIS MATTER** came before the Court for trial on August 21, 2007 and September 4, 2007 upon Plaintiff, Goodstein Realty Boca Raton, LLC's ("Plaintiff") *Complaint to Determine Debt Non-Dischargeable*

*Pursuant to 11 U.S.C. § 523* ("Complaint"). The Complaint seeks a determination that debts owed by James R. Gelinas ("Mr. Gelinas") and Virginia M. Gelinas ("Mrs. Gelinas")(collectively, "Defendants") are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523 (a)(4), and/or 523(a)(6). The Court having heard the testimony of witnesses, having considered the documentary evidence, the candor and demeanor of the witnesses, and having been otherwise fully advised in the premises, hereby sets forth its findings of fact and conclusions of law.

## FINDINGS OF FACT

1.    This case was commenced by the filing of a voluntary Chapter 7 petition on October 12, 2005. Michael R. Bakst was originally appointed as the Chapter 7 Trustee and the first meeting of creditors was initially set for November 30, 2005.

2.    Michael R. Bakst resigned as Trustee, and Patricia Dzikowski was appointed as successor Trustee. Accordingly, the 341 Meeting of Creditors was reset to, and concluded on, January 6, 2006.

3.    The above Adversary Proceeding was filed by the Plaintiff on April 6, 2006.

4.    On July 27, 2006, the Defendants filed their Answer and Affirmative Defenses to the Complaint. On October 30, 2006, the Defendants filed their Amended Answer and Affirmative Defenses.

5.    On March 1, 2001, the Plaintiff entered into a Broker Service Agreement with Mr. Gelinas. (Pl. Ex. 2). The Broker Service Agreement recites that the Plaintiff is aware that Mr. Gelinas, the Broker, "is the qualifying person for Accent Realty and all payments of advances, commissions and expenses made to Broker will be paid to Accent Realty." The Broker Service Agreement also provides in part that:

2

a) Mr. Gelinas was hired "with the title of Mentor, Goodstein Realty Boca Raton" and that he would "also supervise the management of all real estate brokerage activities of his Mentees of the Company in" Boca Raton. (Pl. Ex. 2, ¶1).

b) Mr. Gelinas would be active as a real estate Broker-Associate and he would receive a 75% split of the Plaintiff's brokerage fee for property he sold. (Pl. Ex. 2, ¶3(b)).

c) Mr. Gelinas would receive override commissions from the sales of his Mentees. (Pl. Ex. 2, ¶3(d)).

d) Mr. Gelinas would not "use for his own account, without the written consent of [the Plaintiff] . . . confidential information . . . concerning the business or affairs of clients (including, without limitation, client lists)" which he acknowledged was property of the Plaintiff. (Pl. Ex. 2, ¶5(b)).

6.    Pursuant to the Broker Service Agreement, the Plaintiff advanced $15,000.00 to Mr. Gelinas ("Advance"). The Advance was to have been repaid to the Plaintiff from future commissions earned by Mr. Gelinas.

7.    On November 18, 2001, Teresa M. Brennan ("Mrs. Brennan") entered into an Exclusive Right of Sale Listing Agreement with the Plaintiff ("Listing Agreement")(Pl. Ex. 3), by and through Mr. Gelinas as an authorized listing agent of the Plaintiff, for her property located in Oceanridge, Florida (the "Brennan Property"). The Listing Agreement provided that Mrs. Brennan retained the right to cancel the listing at any time with no penalty to herself.

8. Mrs. Gelinas' real estate salesperson's license was listed with the Plaintiff at the time the Brennan Property was listed with the Plaintiff and at the time of the sale of the Brennan Property.

9.    Both of the Defendants were terminated by Plaintiff's office manager Bonnie Lazar. However, the parties dispute the date

3

of the termination. The Defendants testified that they were terminated in late November, 2001. Leonard Bayer, president of the Plaintiff, and representative of Plaintiff at trial, testified that he believed the Defendants were terminated in late December, 2001. However, Leonard Bayer did not terminate the Defendants himself. Bonnie Lazar, the person who terminated the Defendants, did not testify at trial. Thus, based upon the only competent evidence presented, the Court finds that the Defendants were terminated in late November, 2001.

10.  On December 3, 2001, Mr. Gelinas sent a facsimile with a map of the Brennan Property to Scott Elk, Esquire, attorney for the buyer. The facsimile cover sheet listed Jim and Ginny Gelinas' company as Accent Realty. (Pl. Ex. 16).

11. On December 3, 2001, Scott Elk signed, on behalf of the buyer, a proposed Contract for Sale and Purchase which offered to purchase the Brennan Property for $1,050,000.00. (Pl. Ex. 12). The proposed contract listed Accent Realty as the broker to whom commissions would be due.

12.  Defendants testified that Ms. Brennan orally terminated the Listing Agreement in late November, or early December, 2001. Plaintiff informed Mrs. Brennan that it did not accept Mrs. Brennan's oral cancellation. A typed cancellation notice dated December 10, 2001 ("Cancellation Notice") (Pl. Ex. 4) was typed by Mr. Gelinas and faxed to Plaintiff from Mr. Gelinas' home office. The Cancellation Notice was addressed to "Jim Gelinas, Goodstein Realty." It stated that Mrs. Brennan was cancelling the listing because she was moving back into the home and did not wish to sell it at that time. Plaintiff again refused to accept this Cancellation Notice. Mrs. Brennan later sent a handwritten notice of cancellation on December 17, 2001. (Pl. Ex. "5").

13.  On December 14, 2001, Scott Elk, as trustee, executed a Purchase and Sale contract offering to purchase the Brennan

4

Property as trustee for Ocean Ridge Development Company, LLC ("Buyer") for $1,187,500.00. Mrs. Brennan accepted the offer by signing the contract on December 17, 2001. (Pl. Ex. 11).

14. Ryan E. Willits ("Willits"), the attorney who represented Mrs. Brennan in connection with the closing of the Brennan Property, testified at trial that he handled the title work, and acted as the Settlement Agent for the sale of the Brennan Property. Willits had no definitive recollection of when he ordered title work on the Brennan Property.

15. The Closing Statement dated December 31, 2001 (Pl. Ex. 18) indicates that a closing occurred on the Brennan Property for a sales price of $1,187,500.00. The Closing Statement shows that Accent Realty received a brokerage commission in the amount of $59,375.00.

16. Mr. Gelinas' deposition testimony indicated that a written contract had been executed between Mrs. Brennan and Accent Realty. At trial, Mr. Gelinas testified that he had entered into a verbal commission agreement individually with Mrs. Brennan. Mr. Gelinas ultimately sold the property to Buyer at a five percent commission rate, which was lower than the six percent commission rate specified in the Listing Agreement between Plaintiff and Mrs. Brennan.

17. On or about February 25, 2002, the Plaintiff filed ethics and fee arbitration complaints against the Defendants with: 1) the State of Florida Department of Business and Professional Regulation ("DBPR")(complaint hereinafter referred to as "DBPR Complaint"); and the Grievance Committee of the Realtors Association of the Palm Beaches, Inc. ("RAPB"). (Pl. Ex. 6). The DBPR Complaint was based upon the same set of facts alleged in the complaint filed with RAPB ("RAPB Complaint").

18. On March 18, 2003, DBPR entered a "Closing Order" which determined that the DBPR Complaint against Mr. Gelinas involved a

contract dispute, and that there was insufficient evidence to establish a violation of Florida license law by Mr. Gelinas.

19.  On March 18, 2003, DBPR entered a "Closing Order" which determined that the DBPR Complaint against Mrs. Gelinas contained insufficient evidence to establish a violation of Florida license law by Mrs. Gelinas.

20.  On or about April 10, 2003, the Professional Standards Committee of RAPB conducted an arbitration of the RAPB Complaint against both Defendants.

21.  On or about April 10, 2003, the panel of Arbitrators entered an Arbitration Award in favor of the Plaintiff, and against the Defendants and Accent Realty in the amount of $36,153.75 ("Arbitration Award"). (Pl. Ex. 7).

22.  On June 20, 2003, the RAPB conducted a procedural review at the request of the Defendants. The RAPB upheld the Arbitration Award.(Pl. Ex. 8).

23.  The Defendants and Accent Realty failed to abide by the terms of the Arbitration Award by failing to pay the awarded sum.

24.  On October 3, 2003, the Plaintiff filed a Petition to Confirm Arbitration Award in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. (Pl. Ex.9).

25.  On January 29, 2004, the Court entered a Final Judgment confirming the Arbitration Award and awarding to the Plaintiff compensatory damages in the amount of $36,153.73, pursuant to the Award of Arbitration, plus $326.00 in court costs. (Pl. Ex.10).

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Plaintiff's three-count Complaint seeks a determination that the debts arising from the Arbitration Award owed by the Defendants

to the Plaintiff, and the Advance paid by the Plaintiff to Mr. Gelinas are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and/or 523(a)(6). In making its determination, the Court is obliged "to construe strictly exceptions to discharge in order to give effect to the fresh start policy of the Bankruptcy Code." *Hoffend v. Villa, (In re Villa)*, 261 F.3d 1148, 1152 (11th Cir. 2001)(*citing In re Walker*, 48 F.3d 1161, 1164-65 (11th Cir. 1995)). *See also In re Miller,* 39 F.3d 301, 304 (11th Cir. 1994)(*quoting Caspers v. Van Horne,* 823 F.2d 1285, 1287 (8th Cir. 1987) ("[E]vidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code.")); *Taylor v. Wood (In re Wood)*, 2007 WL 2376788, at *1 (11th Cir. Aug. 21, 2007)("[C]ourts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor, and recognize that the reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural.")(*citing In re Miller*, 39 F.3d 301, 304 (11th Cir.1994)). The burden of proof for section 523 exceptions to discharge is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991). As discussed below, the Court finds that the debts in question are subject to discharge. The Plaintiff's Complaint is denied for failure of proof.

## I.   *Count I - 523(a)(2)(A)*

The Plaintiff maintains that the debts arising from the Arbitration Award and the Advance should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) because these debts are for money obtained by the Defendants through scheme or artifice to defraud, constituting false pretenses, false representations, and actual fraud.

Section 523(a)(2)(A) provides in pertinent part that:

> (a) A discharge under section 727 ... does not discharge any individual debtor from any debt - ...
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) has generally been interpreted to require the traditional elements of common law fraud. *In re Wood,* 2007 WL 2376788, at *1 (*quoting In re Bilzerain*, 153 F.3d 1278, 1281 (11th Cir. 1998)). "The elements of a claim under section 523(a)(2)(A) are: (1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the false representation." *Id*. The concept of false pretenses under section 523(a)(2)(A)is broad. *Id.*

> False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive.... It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction . . .

*Id.* at *2 (*citing In re Gilmore*, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998)).

The Plaintiff argues that when Mr. Gelinas entered into the Broker Service Agreement, he intentionally gave the Plaintiff the

8

false impression that he would act as a real estate broker for the
Plaintiff, when in fact Mr. Gelinas knew he would never pay back
the Advance from future commissions because he intended to use the
Defendants' company Accent Realty to sell his listings. The Court
notes that "[p]roof of fraud in cases involving unfulfilled
promises requires a plaintiff to prove that when a defendant made
promises he knew he could not fulfill them or had no intention of
fulfilling them." *Ford v. Pupello (In re Pupello),* 281 B.R. 763,
766 (Bankr. M.D. Fla. 2002)(*quoting Bropson v. Thomas (In re
Thomas)*, 217 B.R. 650, 653 (Bankr. M.D. Fla. 1998)). In this case,
there was no evidence presented to substantiate the allegation
that Mr. Gelinas made a false representation with the purpose and
intent of deceiving Plaintiff because he did not intend to act as
a real estate broker for the Plaintiff at the time he entered into
the Broker Service Agreement. Nor was there any evidence to show
that Mr. Gelinas did not intend to repay the Advance at the time
he entered into the Broker Service Agreement.

   The Complaint further alleges that while they were sales agents
with Plaintiff, the Defendants used Plaintiff's confidential
information to fraudulently list properties, particularly the
Brennan Property, with Accent Realty, and to fraudulently attempt
to take other clients of Plaintiff, specifically naming Mr. Henry
Goldberg and Mr. Howard Bloom. However, there was no evidence
presented to show that Defendants used Plaintiff's confidential

information to fraudulently list properties with Accent Realty while the Broker Service Agreement was in effect, or that Defendants fraudulently attempted to take Mr. Henry Goldberg, Mr. Howard Bloom, or other clients of Plaintiff.

The Complaint alleges that the parties agreed that Mr. Gelinas would list all properties with Plaintiff while the Broker Service Agreement was in effect. However, the Broker Service Agreement contains no provision to that effect. The evidence showed that pursuant to the Broker Service Agreement, Mr. Gelinas was acknowledged to be the qualifying person for Accent Realty. The Broker Service Agreement provided, among other things, that Mr. Gelinas was hired as a Mentor to supervise the management of real estate activities in Plaintiff's Boca office. Although the Broker Service Agreement provided that Mr. Gelinas would be active as a real estate Broker-Associate with the Plaintiff, it did not expressly prohibit Mr. Gelinas from listing properties through Accent Realty. Therefore, Plaintiff's theory that Defendants fraudulently listed properties through Accent Realty is unavailing. The Court also notes that the Broker Service Agreement provided for Mentee override commissions to Mr. Gelinas. Thus, Plaintiff's unsubstantiated argument, that Mr. Gelinas knew at the time he entered into the Broker Service Agreement that he would never repay the Advance because he intended to list properties with Accent Realty, fails to account for the Mentee override

commissions which would have been available to repay the Advance.

Plaintiff further argues that based upon Mrs. Gelinas having listed the Brennan Property under her name as an agent for Plaintiff, Mrs. Gelinas is culpable of giving the Plaintiff the false impression that Plaintiff would receive the commissions from the sale of the Brennan Property. The Court finds that there was no evidence presented to substantiate this allegation.

Plaintiff also alleged that Defendants fraudulently induced Mrs. Brennan to cancel her listing with Plaintiff and to relist her property with Defendants' company Accent Realty so that they could keep the entire commission from the sale of the Brennan Property for themselves. It is argued that Mr. Gelinas engaged in actual fraud with intent to deceive the Plaintiff by typing the Cancellation Notice for Mrs. Brennan which falsely stated that Mrs. Brennan did not wish to sell at this time. Plaintiff maintains that the Cancellation Notice which is addressed to "Jim Gelinas, Goodstein Realty" is evidence that the Defendants were terminated in late December, 2001, rather than in late November as the Defendants testified. However, in contrast to Plaintiff's interpretation, the Court notes that it is equally plausible that Plaintiff refused to accept the Cancellation Notice precisely because it was addressed to Mr. Gelinas who had already been terminated by the Plaintiff when the Cancellation Notice was sent. It is further argued that Mr. Gelinas was engaged in negotiations

11

with the buyer and had already received an offer for the Brennan Property submitted through Accent Realty when he typed the Cancellation Notice. Although Mrs. Gelinas did not type the Cancellation Notice, Plaintiff argues that she is no less culpable because she was acting as a sales agent for the Plaintiff at the time and she did not remove the Brennan Property listing from the MLS.

The foundation of Plaintiff's argument is that the Defendants fraudulently induced Mrs. Brennan to cancel her listing while the Listing Agreement was still in effect and after a buyer had been procured. However, there was no competent evidence introduced from which the Court could make such a finding.[1]  The evidence showed only that Mrs. Brennan reserved the right to cancel her listing with Plaintiff and that she did so. While Plaintiff's theory that Defendants induced Mrs. Brennan to cancel her listing while the Listing Agreement was in effect is plausible, it was not proved at trial. It is equally plausible that Defendants advised Mrs. Brennan that they were terminated in late November, 2001, and that Mrs. Brennan, wishing to have Mr. Gelinas continue to handle the sale of her property, simply exercised her right to cancel the Listing Agreement with Plaintiff and then relisted her property with Mr. Gelinas. The reasons for denying discharge of a debt must

---

[1] The key witness, Mrs. Brennan, is deceased.

12

be real and not merely conjectural. *In re Wood*, 2007 WL 2376788, *1 (11th Cir. Aug. 21, 2007). Plaintiff failed to prove by a preponderance of the evidence that Defendants acted with fraudulent intent or that they wrongly induced Mrs. Brennan to cancel the listing.

Plaintiff's final argument with respect to section 523(a)(2)(A) is that the Arbitration Award established the elements of the Defendants' actual fraud. As noted in the Court's *Order Denying Plaintiff's Motion for Partial Summary Judgments as to Count III of its Complaint to Determine Debt Non-Dischargeable Pursuant to 11 U.S.C. § 523* ("Order")(C.P. 144), the Arbitration Award did not contain any factual findings, nor did it specify which provisions of the Code of Ethics and Standards of Practice of the National Association of Realtors ("Ethics Code") were violated.[2] Nevertheless, the Court notes that fraud is not an element of any of the provisions of the Ethics Code cited in the RAPB Complaint which formed the basis for the Arbitration Award. In addition, the DBPR Complaint against Mr. Gelinas was determined to be a contract dispute. Thus, the Arbitration Award and the

---

[2]The provisions of the Ethics Code that were alleged to have been violated in the RAPB Complaint were Standards of Practice 16-4, 16-18,and 16-20. Pursuant to Standard of Practice 16-4, realtors shall not solicit a listing that is currently listed exclusively with another broker. Standard of Practice 16-18 prohibits realtors from using information obtained from listing brokers to refer the listing broker's client to other brokers. Standard of Practice 16-20 prohibits realtors from inducing clients of their current firm to cancel exclusive contractual agreements between the client and the firm, prior to or after terminating their relationship with their current firm.

Closing Orders for the DBPR Complaints establish only that the dispute between the parties involved a breach of contract. It is evident that the Defendants had contractual obligations to the Plaintiff and that they breached their contractual obligations by entering into a contract with Mrs. Brennan to sell her property. However, a breach of contract standing alone does not establish the elements required to except a debt from discharge pursuant to section 532(a)(2)(A).

## II.   Count I - 523(a)(4)

Plaintiff argues that Defendants appropriated or converted to their own advantage, Plaintiff's rights to clients, listings, and/or commissions, thereby rendering the Arbitration Award and the Advance nondischargeable debts pursuant to § 523(a)(4).

Section 523(a)(4) provides in pertinent part that:

> (a) A discharge under section 727 ... does not discharge any individual debtor from any debt - ...
>     (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4).

Plaintiff specifically maintains that Defendants converted the property right consisting of the Listing Agreement to their own use without the consent of the Plaintiff and that the alleged conduct constitutes embezzlement or larceny.[3] Courts apply the

---

[3] Although the Complaint alleged that Defendants' conduct constituted fraud or defalcation while acting in a fiduciary capacity, Plaintiff did not argue that Defendants were acting in a fiduciary capacity.

14

federal common law definitions of embezzlement and larceny when determining exceptions to discharge pursuant to § 523(a)(4). *See Bryant v. Lynch (In re Lynch)*, 315 B.R. 173, 179 (Bank. D. Colo. 2004); *Bank Calument v. Whiters (In re Whiters)*, 337 B.R. 326, 332 (Bankr. N.D. Ind. 2006). Embezzlement is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Jacobs*, 243 B.R. 836, 844 (Bankr. M.D. Fla. 2000) (*citing In re Kelley*, 84 B.R. 225, 231 (Bankr. M.D. Fla. 1988)). Larceny is defined as "the fraudulent taking and carrying away of property of another with the intent to convert such property to his own use without the consent of another." *Id*. at 845 (*citing In re Miceli*, 237 B.R. 510, 517 (Bankr. M.D. Fla. 1999)).

> The principal distinction between "embezzlement" and "larceny"' is the manner in which the debtor came into possession of the property which is alleged to be the subject of conduct giving rise to either of those wrongs. "Larceny" involves a concept in which the debtor has wrongfully acquired property of which another person or entity is the owner; "embezzlement" is a concept in which the debtor is legally and consensually in possession of property owned by another which the debtor then diverts to purposes in contravention of another's ownership interest.

*In re Whiters*, 337 B.R. at 331-32. Proof of embezzlement or larceny requires a showing of fraud or fraudulent intent. *In re Kelley*, 84 B.R. at 231; *In re Miceli*, 237 B.R. at 517; *Matter of Weber*, 892 F.2d 534, 538-39 (7th Cir. 1989); *In re Scheller*, 265 B.R. 39, 54 (Bankr. S.D.N.Y. 2001).

15

Plaintiff argues that Defendants misappropriated the Plaintiff's Listing Agreement after a buyer was procured but before the Listing Agreement was cancelled. Plaintiff further argues that Plaintiff would have been the recipient of the commission from the Brennan Property sale but for Defendants causing Mrs. Brennan to cancel her listing in order for her to place her listing with Accent Realty. Plaintiff maintains that on December 3, 2001, while the Listing Agreement was still in effect, Defendants notified the Buyer to list Accent Realty on the proposed Contract for Sale and Purchase by faxing documents to Buyer's attorney with a cover sheet from Accent Realty (Pl. Ex. 16). Plaintiff argues that this conduct renders the debts nondischargeable based upon Defendants' embezzlement or larceny. However, the Court finds that Plaintiff failed to prove embezzlement, i.e., that Defendants with fraudulent intent appropriated Plaintiff's property. The Court also finds that Plaintiff failed to prove larceny, i.e., that Defendants with fraudulent intent took property of the Plaintiff.[4] The testimony indicated that Mrs. Brennan orally canceled the Listing Agreement, however the Plaintiff refused to accept Mrs. Brennan's oral notification of cancellation. While the exact date of Mrs.

---

[4]Although it is not necessary to the Court's dischargeability determination, Plaintiff's allegations beg the question of whether the contract rights comprising the Listing Agreement are "property" as contemplated by the federal common law definitions of embezzlement and larceny.

Brennan's oral communication is unclear, Mrs. Brennan did reserve the right to cancel the Listing Agreement at any time.  There was no proof that Defendants caused or induced Mrs. Brennan to cancel her listing, or that Plaintiff would have received a commission as there is no certainty that the sale would have closed without the involvement of Mr. Gelinas. There was also no evidence presented to show that Defendants fraudulently misappropriated the Listing Agreement.

### III.    Count I - 523(a)(6)

Plaintiff urges that the debts should be excepted from discharge for willful and malicious injury to another entity based upon Defendants having violated the Broker Service Agreement and the Listing Agreement.[5] Plaintiff argues that the Defendants' intentional breach of contract was certain to cause damage to Plaintiff because Plaintiff would not receive the commissions they were entitled to receive from the sale of the Brennan Property. Thus, Plaintiff asks the Court to find that the debts are not subject to discharge pursuant to § 523(a)(6).

Section 523(a)(6) provides in pertinent part that:

---

[5] Plaintiff also argued that the debts should be excepted from discharge for willful and malicious injury to Plaintiff based upon: Defendants notifying the Buyer that Accent Realty held the listing on the Brennan Property; Defendants soliciting Mrs. Brennan's listing for Accent Realty; Defendants inducing Mrs. Brennan to cancel the Listing Agreement with Plaintiff; and Mr. Gelinas typing the Cancellation Notice falsely indicating that Mrs. Brennan had decided not to sell her home when in fact Defendants were actively finalizing the sale of the Brennan Property. As previously discussed, Plaintiff failed to prove these allegations.

17

> (a) A discharge under section 727 ... does not discharge any
> individual debtor from any debt - ...
>> (6) for willful and malicious injury by the debtor to
>> another entity or to the property of another entity;

11 U.S.C. § 523(a)(6).

In *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974, 140 L.
Ed. 2d 90 (1998), the Supreme Court determined that § 523(a)(6)
applies to "acts done with the actual intent to cause injury," but
that it excludes intentional acts that cause injury. *Id*. at 61,
118 S. Ct. at 977. The Supreme Court reasoned that:

> [t]he word "willful" in (a)(6) modifies the word "injury,"
> indicating that nondischargeability takes a deliberate or
> intentional *injury*, not merely a deliberate or intentional
> *act* that leads to injury. Had Congress meant to exempt debts
> resulting from unintentionally inflicted injuries, it might
> have described instead "willful acts that cause injury." Or,
> Congress might have selected an additional word or words,
> *i.e.*, "reckless" or "negligent," to modify "injury."
> Moreover, as the Eighth Circuit observed, the (a)(6)
> formulation triggers in the lawyer's mind the category
> "intentional torts," as distinguished from negligent or
> reckless torts. Intentional torts generally require that the
> actor intend "the *consequences* of an act," not simply "the
> act itself."

*Id*. at 61-62(*citing* Restatement (Second) of Torts § 8A, Comment a,
p. 15 (1964))(emphasis in original).

The *Geiger* Court rejected plaintiff's claim that a medical
malpractice award should be excepted from discharge for willful
and malicious injury noting that plaintiff's,

> encompassing interpretation could place within the excepted
> category a wide range of situations in which an act is
> intentional, but injury is unintended, *i.e.*, neither desired
> nor in fact anticipated by the debtor. Every traffic accident
> stemming from an initial intentional act - for example,
> intentionally rotating the wheel of an automobile to make a

> left-hand turn without first checking oncoming traffic-could
> fit the description. A "knowing breach of contract" could
> also qualify. A construction so broad would be incompatible
> with the "well-known" guide that exceptions to discharge
> "should be confined to those plainly expressed."

*Id.* at 62 (internal citations omitted).

Although *Geiger* appears to reject the proposition that a debt arising from an intentional breach of contract is nondischargeable as a debt for willful and malicious injury, a split of authority has arisen among the circuits that have examined the issue.[6] The Fifth Circuit has determined that a knowing breach of contract that is certain or substantially certain to cause injury may properly be excepted from discharge for willful and malicious injury regardless of the existence of separate tortious conduct. *Williams v. Int'l Bhd. of Elec. Workers (In re Williams)*, 337 F.3d 504, 510 (5th Cir. 2003). This is in accord with an unpublished decision of the Tenth Circuit that affirmed the trial court's determination that an intentional breach of contract was "willful" and "malicious" under 11 U.S.C. § 523(a)(6). *Sanders v. Vaughn (In re Sanders)*, 2000 WL 328136, at *2 (10th Cir. 2000).

In contrast, the Ninth Circuit has held that "to be excepted from discharge under § 523(a)(6), a breach of contract must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.'" *Petralia v. Jercich (In re*

---

[6]The Eleventh Circuit has not addressed the issue of whether a debt arising from an intentional breach of contract may properly be excepted from discharge for willful and malicious injury under § 523(a)(6).

*Jercich)*, 238 F.3d 1202, 1206 (9th Cir. 2001)(determining debt nondischargeable for willful and malicious injury because employer's failure to pay wages was both tortious conduct under California law, and an intentional breach of contract). In an unreported decision, the Sixth Circuit appeared to agree with the Ninth Circuit when it determined that a breach of contract debt unaccompanied by tortious conduct cannot constitute the willful and malicious injury required to trigger § 523(a)(6). *Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 8 (6th Cir. 2004).

Having considered the issue, this Court finds that a debt arising from a breach of contract standing alone is insufficient to except a debt from discharge for willful and malicious injury. Plaintiff's argument that Defendants necessarily knew or were substantially certain that their breach of contract would cause injury to Plaintiff may establish the "willful" prong but it does not establish malice. As to the "malicious" prong, the Eleventh Circuit has "defined that term as used in section 523 as 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *Miller v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir.1989). Furthermore, "malice for purposes of section 523(a)(6) can be established by a finding of implied or constructive malice." *Id. See also Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995).

The Fifth Circuit discussed implied malice under section

20

523(a)(6) explaining that:

> A debtor acts with implied malice when he acts "with the
> actual intent to cause injury. This definition of implied
> malice is identical to the [*Geiger*] Court's explanation of a
> willful injury. The test for willful and malicious injury
> under section 523(a)(6), thus, is condensed into a single
> inquiry of whether there exists "either an objective
> substantial certainty of harm or a subjective motive to cause
> harm" on the part of the debtor.

*Williams*, 337 F.3d at 509 (citations omitted).

This Court respectfully does not agree that the willful and
malicious prongs can be collapsed into a single inquiry. An
objective substantial certainty of harm, which may be found in
connection with any breach of contract, does not have to be
malicious, while a subjective motive to cause harm may indeed be
malicious. Thus although an intentional breach of contract is
willful, it need not be malicious. In this case, the Plaintiff
introduced no evidence that the contract was breached with malice.

The Court is in agreement with Judge Wedoff's conclusion that
section 523(a)(6) requires "tortious conduct as an essential
element of a 'willful and malicious injury.'" *See In re Salvino*,
2007 WL 2028577 (Bankr. N.D. Ill. July 9, 2007). In *Salvino*, Judge
Wedoff examined "language, history, policy and context [to
conclude] that a breach of contract not involving tortious conduct
is outside the scope of § 523(a)(6)." [7] *Id.* at *9. The "mere

_____

[7] The *Salvino* analysis makes several cogent points including: 1) the
*Geiger* Court's statement that "'willful and malicious' ... triggers in the
lawyer's mind the category of 'intentional torts'"; 2) that "willful and
malicious" language has been used to describe conduct warranting punitive

21

failure to abide by contractual obligations is not sufficient to sustain an exception to discharge" under § 523(a)(6). *In re Whiters*, 337 B.R. at 339. In this case, Plaintiff failed to prove that Defendants' breach of contract was accompanied by tortious conduct so as to except the debt from discharge pursuant to section 523(a)(6).

## **CONCLUSION**

Plaintiff bears the burden to prove by a preponderance of the evidence that the Arbitration Award and the Advance are debts that should be excepted from discharge pursuant to §§ 523(a)(2)(A), 523(a)(4), or 523(a)(6). The Court is obliged to construe § 523 exceptions to discharge liberally in favor of the debtor. *See In re Miller,* 39 F.3d 301, 304 (11th Cir. 1994). At trial, Plaintiff failed to introduce any evidence to show that the Arbitration Award and the Advance were obtained by Defendants' fraud or false pretenses, or by Defendants' embezzlement or larceny. Plaintiff also failed to introduce any evidence to show that the Arbitration

---

damages in tort cases, but that willfulness and maliciousness are irrelevant in contract cases where punitive damages are generally unavailable and the remedy is compensation for the loss caused by the breach; 3)the willful and malicious injury exception to discharge dating to the Bankruptcy Act of 1898 has historically been applied to cases sounding in tort, not in contract; 4)that the common law definition of "willful and malicious", which encompasses intentional acts that the defendants believes are substantially certain to cause harm, if applied to contract claims would be broadly destructive of the bankruptcy discharge by dramatically expanding the number of nondischargeable debts and diminishing the scope of the bankruptcy discharge; and 5)that the debtor in possession's ability to reject executory contracts and unexpired leases pursuant to § 365 would be in conflict with § 523(a)(6) if intentional breaches of contract were nondischargeable for willful and malicious injury. *See Salvino*, 2007 WL 2028577, at *7-9.

Award and the Advance were debts arising from Defendants' willful and malicious injury to Plaintiff. Thus, the Court herewith enters judgment in favor of the Defendants.

<u>**ORDER**</u>

The Court, having heard the testimony of witnesses, having considered the evidence presented at trial, the arguments of counsel, the applicable law, the submissions of the parties, and being otherwise fully advised in the premises, hereby

**ORDERS AND ADJUDGES** that:

1) Judgment is awarded in favor of Defendants.

2) The debts identified as the Arbitration Award and the Advance which are owed by the Defendants to Plaintiff are **DISCHARGED.**

3) Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate final judgment shall be entered by the Court contemporaneously herewith.

###

Copies furnished to:
Michael Bakst, Esq.
Eric Glatter, Esq.
AUST